GREENBERG TRAURIG, LLP
J. Gregory Milmoe
One International Place, Suite 2000
Boston, MA 02110
Telephone: 617-310-6000
MilmoeG@gtlaw.com

- and -

David B. Kurzweil (admitted *pro hac vice*)
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678-553-2100
KurzweilD@gtlaw.com

*Counsel for Investment Recovery Group, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., et al.,** | : | Case No. 15-23007 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| INVESTMENT RECOVERY GROUP, LLC, | : | Adv. No. 19-08715 (RDD) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., et al.,** | : | |
| | : | |
| Defendants. | : | |

**DECLARATION OF DANIEL GROTENHUIS IN SUPPORT OF
PLAINTIFF'S (I) REPLY IN SUPPORT OF TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION, AND (II) OPPOSITION TO
DEBTORS' MOTION TO DISMISS ADVERSARY COMPLAINT**

I, Daniel Grotenhuis, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a managing member of Investment Recovery Group, LLC ("IRG"), the above-captioned Plaintiff in the Adversary Proceeding, and submit this declaration in support of the *Emergency Motion of Investment Recovery Group, LLC for a Temporary Restraining Order and Preliminary Injunction* [Adv. Docket No. 1] (the "Motion") and the reply in support of the Motion (the "Reply"),[1] as against the above-captioned Defendants (the "Defendants" or "A&P").

2. I have been professionally involved with purchasing distressed assets for over 30 years. My experience includes managing various professionals with unique backgrounds and expertise to identify and monetize overlooked financial assets of public and formerly public companies. The financial assets include refunds and/or rebates of various state and federal taxes.

3. My team of professionals each have more than 25 years of experience dealing with complex and sophisticated tax issues. It was our observation developed over many years that certain companies, including large public companies failed to take advantage of tax refunds or credits to which they were entitled either because their internal tax departments or outside advisors lacked sufficient sophistication, they had made mistakes applying the law to their situations or, particularly in the case of financially stressed companies, they were unwilling or unable to spend the time and money to pursue what could be time consuming and uncertain strategies of recovery.

4. IRG was formed to salvage these overlooked or forgotten tax assets. Through screening of publicly available information, e.g., financial footnotes in several years of a company's SEC filed financial statements, we would identify candidates who we believed might

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion and Reply, as applicable.

2

have one or more unrealized tax assets and try to approach such companies with an offer to pursue such potential tax assets if they would allow us access to their tax filings and related work papers. The indicia we use to make this screening are highly proprietary and confidential. Commonly, neither the company nor its outside advisors believed that there were any such assets and so we would offer to do the work on a contingency basis.

5. IRG would offer to work for no charge as well as fronting expenses, with the understanding that its compensation would come from the recovery if any. If there were no recovery, the company would not owe us anything.

6. Our most common formulation was to split with the company the net recoveries (e.g., fifty-fifty) without any payment from IRG to the company, or IRG would offer to buy the right to any tax refund for an agreed upon purchase price. With respect to A&P, we offered an alternative in which IRG would deduct all expenses from its share _and_ pay A&P a $150,000 fee after reviewing its tax information, but prior to the time of any actual recovery in return for a 75-25 share of any eventual recovery.

7. These arrangements would be agreed to prior to the time IRG had access to a company's confidential tax filings and workpapers because without such access, notwithstanding our screening methods, it is impossible to know whether there was real value susceptible of recovery.

8. As was typical, A&P initially resisted the idea that there could be any valuable but overlooked tax attributes recoverable by it, but after months of pursuit and discussion IRG and A&P finally entered into an agreement on September 7, 2019 which provided for IRG's being responsible for all expenses, a payment by IRG of $150,000 promptly after identifying any tax attributes to be pursued, and a 75/25% sharing of eventual recoveries.

9. IRG was advised by A&P that it was necessary to have the Contract approved by the Bankruptcy Court and that it should be submitted for approval under the OCP Procedures already in place.  A&P did not offer IRG any other options on how it could be retained in the bankruptcy cases.

10. At no time during the Contract negotiations did any person from or on behalf of A&P advise us that all tax refunds were subject to a lien in favor of secured lenders and that our agreed-upon compensation arrangement was subject to such lenders' explicit consent.  (Only after we provided A&P with the Identified Tax Assets in October 2019, were we first informed by A&P (and the secured lenders) that A&P would not be able to perform its side of the bargain under the Contract as a result of the lenders' liens on the tax assets and its administrative insolvency.)

11. IRG began work immediately upon approval of its Contract by the Bankruptcy Court.

12. In the course of meticulously reviewing A&P's tax returns dating back to 1988, and Pathmark's tax returns going back to 1991, IRG became aware ███████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████

13. As required by its Contract with A&P, IRG described these potential Tax Assets to the Defendants in writing in October 2019 (and through subsequent conversations) and paid A&P $150,000. However, when A&P became aware of the potential size of the recovery, it sought to renegotiate the terms of the Contract, claiming that the Bankruptcy Court would never approve such a high fee.

14. Similarly, A&P's secured lender through counsel claimed that any tax refunds belonged to the secured lender and that IRG was not entitled to any payment out of the refunds and added that A&P was administratively insolvent and therefor lacked the resources to pay IRG.

15. A&P also tried to terminate our Contract threatening that it would hire more reasonably priced tax advisors to pursue these assets while claiming, inconsistently, that our identification of the potential tax attributes on October 3, was useless.

16. A&P did not and apparently still does not understand the information that IRG had delivered in October 2019. In fairness, it would take a high degree of tax sophistication to understand the strategy proposed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17. After several months of additional work, on February 7, 2020, IRG delivered to A&P a detailed draft of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The February Memorandum needs further work including review, input and cooperation from A&P's representatives. However, IRG's refined analysis continues to show that recoveries ranging from a very conservative $6 million to as much as $18 million in respect of those assets can be obtained in a reasonable period of time.

5

18. Our Contract with A&P is intended to, and we believe does, protect the integrity of our intellectual effort and knowhow by preventing A&P from pursuing for its sole benefit any tax assets we have identified. It makes clear that A&P cannot use the fruits of our labor unless we are paid in accordance with the Contract, subject, as always, to approval of the fairness of the deal by the Bankruptcy Court.

19. Finally, IRG is currently negotiating to be retained by other potential clients, including at least one matter in which counsel to the Secured Lenders is involved. A failure to protect the integrity of IRG's Proprietary Information here would have a predictably negative impact on those negotiations.

[Signature on Following Page]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 7, 2020

_____
Daniel Grotenhuis